*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1564**

Wendy Lee,
Relator,

vs.

Ind. School District #833,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed July 13, 2015
Affirmed
Connolly, Judge**

Department of Employment and Economic Development
File No. 32407829-3

Peter B. Knapp, William Mitchell Law Clinic, Renee M. Branshaw (certified student attorney), St. Paul, Minnesota (for relator)

Michael J. Waldspurger, Abby M. Novak, Rupp, Anderson, Squires & Waldspurger, P.A., Minneapolis, Minnesota (for respondent)

Lee B. Nelson, Munazza Humayun, Minnesota Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department)

Considered and decided by Connolly, Presiding Judge; Kirk, Judge; and Smith, Judge.

UNPUBLISHED OPINION

**CONNOLLY**, Judge

Relator challenges the decision of the unemployment-law judge (ULJ) that respondent, the school district that employed her, discharged her for misconduct, arguing that: (1) she was discharged for her conduct with the student crossing guards, not for tardiness; (2) in any event, her tardiness was not misconduct; and (3) the ULJ's finding that she yelled at the student crossing guards was not supported by substantial evidence. Because relator's discharge was based on her behavior considered as a whole, including both her repeated tardiness and her yelling at the student crossing guards, because substantial evidence supported the ULJ's findings that relator yelled at the student crossing guards, and because both relator's repeated tardiness and her yelling constituted employment misconduct, we affirm.

## FACTS

Relator Wendy Lee worked as a paraprofessional for respondent Ind. School District (ISD) #833. Her employment record shows that, in 2002 and 2003, she received letters concerning her tardiness. In 2011, she received a letter directing her to use a courteous and professional tone in communicating with staff, parents, and community members; in 2012, she received a letter directing her to arrive at work on time and to display a positive attitude towards planned student activities.

In August 2013, relator received a letter stating that she had been tardy four times during August and should arrive at work and return from breaks in a timely manner. In November 2013, she received a letter of reprimand concerning her six failures to be on

time for work in October and November. In December 2013, relator received a two-day unpaid suspension for tardiness as well as a letter of reprimand concerning her three late arrivals in September and three more late arrivals in November.

Relator again arrived late for work on February 28, 2014. In March 2014, a meeting was held concerning this late arrival; the meeting also concerned incidents between 8:05 and 8:10 on the mornings of March 17, 19, 25, and 27 in which relator directed student crossing guards in the school parking lot to lift their "Stop" flags so she could drive past them. On March 27, relator received a letter informing her that she had been terminated for "repeated tardiness in reporting to work and conducting [her]self in an unprofessional manner with peers, students[,] and supervisors, and displaying gross misjudgment."

Relator applied for unemployment benefits, and respondent Department of Employment and Economic Development (DEED) determined that she was ineligible. Relator challenged this determination; following a telephone hearing, a ULJ determined that relator was discharged for employment misconduct based on findings that she violated her employer's reasonable expectations concerning her punctuality and professionalism. Her request for reconsideration resulted in an affirmance of the ULJ's decision that she was discharged for misconduct.

Relator now seeks review of the ULJ's decision, arguing that (1) she was discharged not for tardiness but for her conduct with the student crossing guards; (2) in any event, her tardiness on February 28, 2013, did not amount to employment misconduct; (3) the crossing-guard incidents did not amount to employment misconduct;

3

and, (4) in the alternative, the findings of fact concerning the crossing-guard incidents were not supported by substantial evidence.

## D E C I S I O N

The purpose of chapter 268 is to assist those who are unemployed through no fault of their own. Minn. Stat. § 268.03, subd. 1 (2014). The chapter is remedial in nature and must be applied in favor of awarding benefits, and any provision precluding receipt of benefits must be narrowly construed. Minn. Stat. § 268.031, subd. 2 (2014). There is no burden of proof in unemployment-insurance proceedings. Minn. Stat. § 268.069, subd. 2 (2014). There is no equitable denial or allowance of benefits. Minn. Stat. § 268.069, subd. 3 (2014). Employees discharged for misconduct are not eligible for benefits. Minn. Stat. § 268.095, subd. 4 (2014).

Employment misconduct is "any intentional, negligent, or indifferent conduct, on the job or off the job that displays clearly: (1) a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee; or (2) a substantial lack of concern for the employment." Minn. Stat. § 268.095, subd. 6(a) (2014). "Whether an employee committed employment misconduct is a mixed question of fact and law. Whether the employee committed a particular act is a question of fact. . . . But whether the act committed by the employee constitutes employment misconduct is a question of law, which we review de novo." *Peterson v. Nw. Airlines Inc.*, 753 N.W.2d 771, 774 (Minn. App. 2008) (citations omitted), *review denied* (Minn. Oct. 1, 2008).

4

### 1. Tardiness

Relator argues first that the "triggering reason for [her] discharge was her allegedly unprofessional conduct toward student crossing guards and not her history of tardiness." But ISD #833's March 27, 2014, termination letter told relator: "You are being terminated *for repeated tardiness in reporting to work* and conducting yourself in an unprofessional manner with peers, students and supervisors, and displaying gross misjudgment." (Emphasis added.) The letter went on to review the six letters of discipline relator had received, five of which referred to her tardiness; it also mentioned at least two conversations with relator concerning tardiness.

Relator argues that she was not terminated for tardiness because her last tardiness was February 28 and she was not terminated until March 27, after the incidents with the student crossing guards. But the tardiness and those incidents are not mutually exclusive causes of termination: relator's "behavior may be considered as a whole" in determining whether she was discharged for misconduct. *Drellack v. Inter-Cnty. Cmty. Council, Inc.*, 366 N.W.2d 671, 674 (Minn. App. 1985). Relator's tardiness increased significantly during the last months of 2013, resulted in her suspension in December 2013, and recurred in February 2014; the ULJ did not err by finding that tardiness was one cause of relator's termination in March 2014.

Relator also argues that her February 28 tardiness did not rise to the level of employment misconduct because she was only one minute late that day. But, as the termination letter indicates, it was not the February 28 tardiness alone that was considered grounds for termination: it was relator's repeated tardiness over a period of

5

months that amounted to employment misconduct and led to her termination. *See id.* (employee's behavior may be considered as a whole in determining misconduct).

## 2.     Incidents with Student Crossing Guards

Relator argues that the findings concerning her conduct with the student crossing guards were not supported by substantial evidence. But relator did not deny that she told the student crossing guards to raise their "Stop" flags: when she was asked on what dates ISD #833 said she did this, she answered that she thought she did it only twice, although ISD #833 said she did it on four occasions. When asked if she was yelling at the crossing guards, she said, "I wouldn't say yelling. I would say speaking as loud as I can" but then agreed with the ULJ that "somebody speaking as loudly as they can . . . that's yelling."

The ISD #833 representative described the March 27 incident to the ULJ: "[When relator was o]n her way in to . . . the parking lot numerous parents and staff reported that she was . . . yelling at our student patrol. . . . [Relator] said . . . you need to let this traffic go. Clearly she was concerned about being late." The ULJ then questioned the ISD #833 representative:

> Q:     What did [relator] . . . say was going on?
> A:     She said the students were in the wrong place and they were doing it wrong.
> Q:     Okay. Is that true?
> A:     No.  . . . We pay someone as an adult crossing guard . . . [T]hat person's job [is] to tell the students where to stand and what to do. It is not up to anybody else to tell the students. In fact, it would confuse the student[s] to have an adult tell them something different than they've been instructed by the adult crossing guard.

6

Q: Did the parents or the two faculty members that raised the issue, did they give some detail as to what [relator] said or how she said it?

A: Yes, they indicated that there [was] an adult outside yelling at the students to lift the flag so she could get through.

Q: All right.

A: And they were very, very concerned.[1]

The ULJ found that ISD #833 "present[ed] a highly plausible and logical chain of events leading to the discharge" and noted that its "witnesses and version of the events [were] more credible [than relator's]." This court "gives deference to the credibility determinations made by the ULJ . . . [and] will not disturb the ULJ's factual findings when the evidence substantially sustains them." *Peterson*, 753 N.W.2d at 774.

Relator objects that some of the testimony during the telephone hearing was based on hearsay evidence. But the evidentiary standard in an unemployment hearing need not conform to the rules of evidence. Minn. Stat. § 268.105, subd. 1(b) (2012). Substantial evidence, including relator's own testimony, supported the finding that relator yelled at the student crossing guards to raise their flags so she could get through, *see Peterson*, 533 N.W.2d at 774, and this conduct violated the standards of behavior ISD #833 had a right to reasonably expect. *See* Minn. Stat. § 268.095, subd. 6(a).

---

[1] Relator argues that this testimony contradicts the termination letter because it mentions only parents and teachers complaining about relator's conduct, while the termination letter referred to "parents, other staff, the bus patrols, and the adult crossing guard" complaining. But the testimony concerned only the March 27 incident; complaints about other incidents were made by the bus patrols and the adult crossing guard.

Relator's repeated tardiness and her conduct with the student crossing guards constituted employment misconduct that caused her termination. She is ineligible for unemployment benefits.

**Affirmed.**